**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| FORTRES GRAND CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:12-cv-535 |
| | ) | |
| WARNER BROS. ENTERTAINMENT INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION and ORDER</u>

A leading trademark treatise raises this question in one of its final chapters: "Is it trademark infringement if a fictional company or product in a movie or television drama bears the same name or brand as a real company or product?" 6 *McCarthy on Trademarks and Unfair Competition* § 31:149 (4th ed.). The treatise immediately goes on to note that "[t]here is surprisingly little case law on point." *Id.* That's unfortunate because it's the exact question at the heart of this case.

Warner Bros. produced the latest Batman film – *The Dark Knight Rises* – and it includes a handful of references to a fictional software program called "clean slate." The Plaintiff, Fortres Grand Corporation, manufactures and sells a real software program called "Clean Slate." Fortres's theory is that it is in fact trademark infringement when a fictional product bears the same name as its real product. Warner Bros. takes the opposite view and has moved to dismiss the case.

I agree with the treatise that it's somewhat surprising that this is a relatively uncharted territory of trademark law. With the number of movies and television shows produced each year,

1

one might expect that this issue would arise with some degree of frequency.  In any event, under existing trademark law as detailed below, I ultimately conclude there is no trademark infringement here and will therefore grant Warner Bros.'s motion to dismiss.

## BACKGROUND

Fortres Grand develops, markets, and sells software.  Since 2000, it has marketed and sold a software called "Clean Slate."  The Clean Slate software protects the security of computer networks by erasing all evidence of user activity so that subsequent users see no evidence of a previous user's activity, meaning that each new user starts his or her computer activity with a "clean slate."  Fortres Grand has sold millions of dollars worth of its Clean Slate software.  In 2001, Fortres Grand obtained a federal trademark registration for the use of "Clean Slate" in connection with "computer software used to protect public access computers by scouring the computer drive back to its original configuration upon reboot."

Warner Bros. is one of the most famous names in movie history.  In the summer of 2012 it released its latest Batman film, *The Dark Knight Rises*.  One of the plot lines in the film involves the character Selina Kyle and her attempt to procure a software program that will erase her criminal history from every computer database in the world.  (She likely has a long rap sheet – Selina Kyle's alter ego is none other than the supervillainess Catwoman.)  The software program she is trying to procure was designed by the fictional company Rykin Data and is referred to four times in the film as "clean slate."  For instance, in a scuffle with another character, Kyle demands:  "So where is it – the program, the clean slate?"  In another instance, she tells Batman (not realizing he is Bruce Wayne's alter ego):  "Wayne says you can get me the clean slate."

In addition, two websites – rykindata.com and rykindata.tumblr.com – were created to promote the film.  These websites are consistent with a recent trend in the online advertising of films: rather than just creating a straightforward promotional website where consumers can get information about the film (like, in this instance, www.thedarkknightrises.com), additional websites are created that market the film in a more subtle or creative way.  In this instance, the websites are essentially a creative outgrowth of the fictional world of the film.  They look like what a (fictional) citizen of Gotham might find if they were looking for information on the (fictional) Rykin Data company.  They include images of fictional police reports related to the fictional character Selina Kyle, a fictional police file labeled "Cat Burglar Investigation," a fictitious software patent, and an endorsement from a fictional Gotham City Better Business Bureau (BBB).

These websites also use the term "clean slate" to describe the software referenced in the film.  The Tumblr website, for example, features a mock web page for the fictional Rykin Data Corporation, which contains further information about the fictional software described in the film.  One of the pages on the website is titled "PROGRAM: 'CLEAN SLATE'" and explains that "'Clean Slate' is the informal name for Rykin Data's primary service, in which the corporation will amass personal histories (specifically off the Internet) and destroy it permanently."  http://rykindata.tumblr.com/cleanslate  Both websites also contain a fictitious patent for the software, the abstract of which states that the invention has the effect of "granting the subject a clean slate within the digital world."  *See*, *e.g.*, http://rykindata.tumblr.com/image/25593826380  The Tumblr site also contains this statement: "Rykin Data: Providing Fresh Starts since 2004. . . .  Clean slates are possible. . . . Have a fresh,

clean start."  http://rykindata.tumblr.com/

Allow me a detour for a moment to discuss why I am referencing the contents of these websites as part of the factual background of this case when they are not themselves detailed in the Complaint.  Fortres Grand believes that for purposes of a motion to dismiss I should disregard the content of these websites because they were only referenced in the Complaint and not actually attached to it.  I disagree.  As the Seventh Circuit noted just last month:  "[W]e have taken a broader view of documents that may be considered on a motion to dismiss, noting that a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice."  *Williamson v. Curran*, 2013 WL 1338038, at *7 (7th Cir. Apr. 4, 2013).  The websites in this case are clearly "central to the complaint and are referred to in it," and so for that reason they are being considered in deciding the pending motion to dismiss.

## DISCUSSION

Fortres Grand filed this suit on September 19, 2012 alleging three counts based on the use of "clean slate" in the film and on the websites: 1) trademark infringement under the Lanham Act (15 U.S.C. § 1051 *et seq.*);  2) unfair competition under the Lanham Act; and 3) unfair competition under Indiana state law.[1]  Warner Bros. responded by moving to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

---

[1]It's worth noting that the Complaint does not bring a claim under the Trademark Dilution Act, which amended the Lanham Act.  *See* 15 U.S.C. §§  1125(c), 1127. Perhaps it's because Fortres Grand recognizes that its "Clean Slate" trademark is not a "famous" one, which is a requirement for bringing a trademark dilution case.  *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 811 (7th Cir. 2002).

A motion to dismiss pursuant to Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). When reviewing a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the non-movant's favor. *Id.* Pursuant to Rule 8(a)(2), a complaint must contain "a 'short and plain statement of the claim showing that the pleader is entitled to relief,' sufficient to provide the defendant with 'fair notice' of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (internal citations omitted).

## I. Background on Trademark Law and "Reverse Confusion"

As an initial matter, it is well established that all three of Fortres Grand's claims – infringement, federal unfair competition, and state unfair competition – are analyzed under the same trademark infringement analysis. *See Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997); *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 619 (7th Cir. 1993); *Vision Ctr. Nw., Inc. v. Vision Value, LLC*, 673 F. Supp. 2d 679, 683 (N.D. Ind. 2009) (applying the same analysis to claims of unfair competition and trademark infringement under Indiana law as applied to Lanham Act claims because they all turned upon

the same law and facts).

An essential ingredient of trademark infringement is "a likelihood of confusion among consumers as to the source" of a product. *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). Thus, "[o]nly a confusion about origin supports a trademark claim, and 'origin' for this purpose means the 'producer of the tangible product sold in the marketplace.'" *Eastland Music Group, LLC v. Lionsgate Entertainment, Inc.*, 707 F.3d 869, 872 (7th Cir. 2013) (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 31 (2003)). And although the hallmark of trademark infringement is protecting against consumer confusion, it is not enough that there just be some generalized confusion: "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012) (quotations omitted).

A classic trademark infringement case involves "forward" confusion in which "the junior user attempts to capitalize on the senior user's good will and established reputation by suggesting that his product comes from the same source as does the senior user's product." *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 436 (7th Cir. 1999) (quoting *Ameritech, Inc. v. Am. Info. Techns. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987). For example, if a small technology company created software for managing spreadsheets and started selling it as "Excel," Microsoft – the senior user of that trademark – would no doubt file a suit on a theory of forward confusion.

That's not this case; Fortres Grand's "Clean Slate" software does not have anywhere near the prominence of a program like Excel. Instead, Fortres Grand's theory is that this is a case of

"reverse" confusion, and here's how the Seventh Circuit has explained that concept:

> [R]everse confusion . . . exists when a junior user uses its size and market penetration to overwhelm the senior, but smaller, user. The "senior user" is the first to adopt and use a mark anywhere in the country. The "junior user" is the second user, regardless of whether it adopts and uses a mark in a geographically remote location. Reverse confusion doctrine protects the senior user's control of its mark and the goodwill created by the mark from a junior user's employment of the mark, and protects the public from being deceived into believing that the senior user's product emanates from, is connected to, or is sponsored by the junior user.

*Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 484 (7th Cir. 2007) (internal quotations, citations, and brackets omitted). So in a reverse confusion case, the "large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user" such that "the public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter." *Johnny Blastoff*, 188 F.3d at 436.

In order to state a claim for reverse confusion in this case, Fortres Grand has to make plausible allegations that Warner Bros. saturated the market with a product that the public has been "deceived into believing . . . emanates from, is connected to, or is sponsored by" Fortres Grand. *Custom Vehicles*, 476 F.3d at 484. As we'll see in the next section, I think the fatal flaw in Fortres Grand's case has to do with correctly identifying the exact *product* that Warner Bros. has introduced to the market – a film, not a piece of software. Before we turn to that point, however, it may be helpful to provide some examples of reverse confusion cases to make the concept more concrete and to set the stage for the next section.

The paradigm for a reverse confusion case was established in *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F. Supp. 1219 (D. Colo. 1976), *aff'd*, 561 F.2d 1365 (10th

Cir. 1977).  Goodyear Tire & Rubber Co. started selling a new radial tire under the trademark "Bigfoot."  It turned out, however, that a tire franchise system in the western U.S. – Big O Tire Dealers – was already selling a tire under that name.  Big O sued on a theory of reverse confusion and won a jury verdict, which the 10th Circuit affirmed.

Another example of reverse confusion comes from the case of *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992), which involved The Quaker Oats Company's use of the words "Thirst Aid" in advertising for Gatorade (as in, "Gatorade is Thirst Aid . . .").  At the time it did this, a small, Vermont-based company had already been selling beverages under the name "Thirst-Aid."   The Vermont company sued on a theory of reverse confusion and won a bench trial; the Seventh Circuit affirmed the infringement finding.

A final example can be found in *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32 (1st Cir. 2006).  That case involved the Maytag Corporation's national launch of a new line of electric kitchen appliances with the name "Jenn-Air Attrezzi."  The problem was that when Maytag chose the name for the product, there was already a store in New Hampshire named "Attrezzi" that specialized in fine kitchen products and services.   The New Hampshire store sued Maytag on a reverse confusion theory and won a jury trial verdict, which was then affirmed on appeal.

Each of these three cases demonstrate the familiar framework of a reverse confusion case:  a small regional player uses a trademark for a product (tires, beverages, appliances) that is then completely overwhelmed when a much larger player (Goodyear, Quaker Oats, Maytag) rolls out a similar product with the same trademark on a nationwide level, and what ensues is mass consumer confusion.  According to Fortres Grand, that's exactly what we have here: "a worst-case scenario of reverse confusion" in which "Fortres Grand was damaged by the reverse

confusion resulting from Warner Bros' saturation of the market with its big-budget film and its promotional websites."  [DE 26 at 1,4.]

**II.  The Analytical Conundrum of Real Trademarks Applied to Fictional Products**

There's an obvious problem with Fortres Grand's argument that this is a worst-case scenario of reverse confusion:  Warner Bros. "clean slate" software only exists in the fictional world of Gotham; it does not exist in reality.  This may seem to be a small point, but it has big ramifications for the consumer confusion analysis, which become apparent once you realize the argument that Fortres Grand has not made – and cannot make.

Recall that, in order to state a claim for reverse confusion, Fortres Grand has to make plausible allegations that Warner Bros. saturated the market with a product that the public has been "deceived into believing . . . emanates from, is connected to, or is sponsored by" Fortres Grand.   But Fortres Grand's only claim in this regard is that it has been damaged by Warner Bros' saturation of the market with its "its big-budget film and its promotional websites." What Fortres Grand does not (and cannot) argue is that it has been damaged by Warner Bros' saturation of the market with its (fictional) "clean slate software."

That distinction – between Warner Bros. real product (a movie) and its fictional product (software) – makes a world of difference because so much of the consumer confusion analysis depends on a comparison of the products at issue.  In analyzing the potential for consumer confusion in this case, one must compare Fortres Grand's "Clean Slate" software to Warner Bros.' real product – *The Dark Knight Rises*.

Indeed, this is exactly the conclusion that the few courts who have addressed this issue have reached.  For example, *Ocean Bio-Chem, Inc. v. Turner Network Television, Inc.*, 741 F.

Supp. 1546 (S.D. Fla. 1990) involved the made-for-TV movie *Incident at Dark River* in which a

child dies from pollution caused by a fictional company called "Starbrite Batteries." Star Brite

Distributing Inc., a real company owned by Plaintiff Ocean Bio-Chem, sued the makers of the

movie on the theory that the movie's use of its trademark created a likelihood of confusion.  The

court rejected this claim, in large part because it found the proper comparison for a likelihood of

confusion analysis was between each sides' *real* products – the movie *Incident at Dark River*

versus Start Brite Distributing's products.  As the court explained:

> The parties disagree as to which products the court properly should compare for
> this prong of the likelihood of confusion analysis. Ocean argues that the proper
> comparison is of its products and the batteries manufactured by the fictional
> company in the movie. According to Ocean, the consuming public could believe
> that Ocean was the company represented in the movie, because the movie makes
> shorthand reference to the fictional company as simply Star Brite and does not
> clarify whether it produces only batteries. In contrast, defendants argue that the
> proper comparison is between Ocean's cleaning products marketed under the Star
> Brite name and defendants' ultimate product, the movie itself.
>
> The court concludes that it must compare the parties' ultimate products: those that
> Ocean markets under the Star Brite name and the movie itself. Only this reading
> is consistent with the statutory language, which protects Ocean against uses of its
> trademark that are "likely to cause confusion, or to cause mistake, or to deceive as
> to ... the origin, sponsorship, or approval of his or her goods ... by another
> person." 15 U.S.C. § 1125(a)(1).  Making this comparison, Ocean's and
> defendants' products "are not even remotely similar."

*Id.* at 1557.

Similarly, *Davis v. Walt Disney Co.*, 430 F.3d 901 (8th Cir. 2005) involved the Disney

Channel's broadcast of *Up, Up, and Away*, another made-for-TV movie about a family of

suburban superheroes who uncover and thwart the misdeeds of an environmental software

company named "Earth Protectors."  The Plaintiff was the founder and president of an

environmental advocacy organization called Earth Protector, Inc., and used the "Earth Protector"

phrase in connection with educational materials, t-shirts, and occasional broadcasts of a local

cable-access show called "The Earth Protector Show."  Just as in *Ocean Bio-Chem*, the court

held that the proper comparison for a likelihood of confusion analysis was between each sides'

*real* products:

> We reject the appellants' argument that competitive proximity exists simply
> because the appellants and appellees both offer educational and informational
> services. The appellees' only use of the mark in question was in a fictional
> children's movie that aired only on the Disney Channel.  Thus, that movie is the
> product to which we must apply the [likelihood-of-confusion] factors. *See Ocean
> Bio-Chem* . . . . We find that a movie designed for children's entertainment that
> airs on a national children's network is not so similar to an infrequently broadcast
> cable-access environmental advocacy television program that consumers are
> likely to believe the two products came from the same source.

*Id.* at 904.

Likewise, in *Caterpillar Inc. v. Walt Disney Co.*, 287 F. Supp. 2d 913 (C.D. Ill. 2003) the

court denied an attempt by Caterpillar, Inc. to prevent the home-video release of *George of the

Jungle 2* just because its farm equipment was featured in the movie.  As the court aptly noted:

"Put another way, it appears unlikely . . . that any consumer would be more likely to buy or

watch *George of the Jungle 2* because of any mistaken belief that Caterpillar sponsored this

movie."  *Id.* at 920.

The reasoning underlying all of these cases applies with equal force here.  This would be

an easy case if Warner Bros. had saturated the market by rolling out a huge, nationwide

campaign for a new computer program called "Clean Slate."  That really would have been a

classic, "worst case scenario" of reverse infringement.  But of course Warner Bros. didn't do

anything of the sort.  Instead, it merely released a fictional movie that happened to involve an

entirely fictional software referred to descriptively as "clean slate."

11

To state a claim for reverse confusion in this instance, Fortres Grand would have to plausibly allege one of two things: 1) consumers have been deceived into believing that the *fictional* "clean slate" software in the movie "emanates from, is connected to, or is sponsored by" Fortres Grand or 2) consumers have been deceived into believing that the film *The Dark Knight Rises* "emanates from, is connected to, or is sponsored by" Fortres Grand. *Custom Vehicles*, 476 F.3d at 484. For entirely obvious reasons, neither of these is a plausible claim. First, no consumer – reasonable or otherwise – can believe the *fictional* "clean slate" software in the movie emanates from, is sponsored by, or connected to Fortres Grand because the fictional software does not exist in reality. Any consumer going online or into a store looking to buy the "clean slate" software mentioned in *The Dark Knight Rises* would quickly find that they are unable to do so because *it is not a real product*.

Another way of understanding this point is to say that Warner Bros. is only using "clean slate" in a "non-trademark" way. In other words, the film's use of the phrase "clean slate" is not "identifying the source" of the software product (because there is no real software product), nor is it really "identifying the source" of the film. *Interactive Products Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003). ("If defendants are only using IPC's trademark in a 'non-trademark' way—that is, in a way that does not identify the source of a product—then trademark infringement and false designation of origin laws do not apply.); *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302, 307 (9th Cir. 1992) (holding that infringement laws "simply do not apply" to a "non-trademark use of a mark").

Second, no consumer – reasonable or even unreasonable – would believe that the *The Dark Knight Rises* itself is connected to Fortres Grand. Warner Bros. makes this point well:

"Plaintiff is not in the motion picture business, and it would be absurd to think that customers buy tickets to *The Dark Knight Rises* or purchase the DVD/Blu-ray because of a perceived association of the Film with Fortres Grand's products."  [DE 29 at 10.]   As the Seventh Circuit recently put it in a similar context, the Complaint "does not allege that the use of [the trademark] has caused any confusion about the *film's* source – and any such allegation would be too implausible to support costly litigation."  *Eastland*, 707 F.3d at 871 (emphasis added).

The same analysis applies to the use of "clean slate" on the promotional websites.  To the extent it can be said that the term "clean slate" on these sites is even being used as a trademark, it can only be to indicate the source or origin for the film *The Dark Knight Rises*.  For all the reasons already explained above, there is no plausible claim for consumer confusion regarding a consumer's purchasing decision between the two products that actually exist in reality – Fortres Grand's software and Warner Bros.'s film.

All of the foregoing analysis has something of an abstract feel to it so let me conclude this section from a more pragmatic point of view and a return to the basic principles of trademark law.  Again, trademark infringement requires "a likelihood of confusion among consumers as to the source" of a product.  *Platinum Home*, 149 F.3d at 726.  "Confusion" here means "confusion about origin," and "origin" means "the producer of the tangible product sold in the marketplace." *Eastland Music*, 707 F.3d at 872.  And a vague, generalized confusion is not enough: "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally."  *Rearden LLC*, 683 F.3d at 1202–03.  Here, there simply is no plausible claim that consumers will make "mistaken purchasing decisions" about the "tangible product" being sold in the marketplace:  no one looking for Fortres Grand's software is likely to

mistakenly buy a ticket to *The Dark Knight Rises*.  Thus, the fact that there is no plausible claim for consumer confusion here is sufficient grounds by itself to dismiss the case.

### III.  Defendant's use of "Clean Slate" is also Protected by the First Amendment

Even if there were a potential for consumer confusion here, this case still must be dismissed because Warner Bros.'s use of term "clean slate" is also protected by the First Amendment.

The Second Circuit's decision in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) is one of the beacons used to navigate the murky boundary between trademark law and the First Amendment.  In *Rogers*, the plaintiff claimed that the defendant's film *Ginger and Fred* created the false impression that Ginger Rogers was associated with the film.  The Second Circuit found that the First Amendment interests trumped the trademark claims, and in doing so established the now widely used *Rogers* test.  Here's the Second Circuit's famous formulation of that test:

> [T]he [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression.  In the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.

*Rogers*, 875 F.2d at 999.  *Rogers* thus essentially sets up a two-pronged test:  the Lanham Act is inapplicable to "artistic works" as long as the defendant's use of the mark is (1) "artistically relevant" to the work and (2) not "explicitly misleading" as to the source or content of the work.

While *Rogers* was focused on the title of an artistic work, numerous courts have expanded it to apply to artistic works more broadly.  As the Ninth Circuit recently held, "[a]lthough this test traditionally applies to uses of a trademark in the title of an artistic work,

14

there is no principled reason why it ought not also apply to the use of a trademark in the body of the work." *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008). The Second, Sixth, and Eleventh Circuits have all reached the same conclusion. *See Univ. of Alabama Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012) (expressing "no hesitation in joining our sister circuits by holding that we should construe the Lanham Act narrowly when deciding whether an artistically expressive work infringes a trademark" and therefore applying the *Rogers* test to "paintings, prints, and calendars"); *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 928 n.11 (6th Cir. 2003) (the *Rogers* test is "[not] limited to titles of artistic works . . . [and is] generally applicable to all cases involving literary or artistic works where the defendant has articulated a colorable claim that the use of a celebrity's identity is protected by the First Amendment"); *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group*, 886 F.2d 490, 495 (2d Cir. 1989) (the *Rogers* test is "generally applicable to Lanham Act claims against works of artistic expression").

In this case, there can be little doubt that Warner Bros. has satisfied both prongs of the *Rogers* test. The first prong – artistic relevance – establishes a purposely low threshold which is satisfied unless the use "has no artistic relevance to the underlying work whatsoever." *Rogers*, 875 F.2d at 999. *See also E.S.S. Entm't*, 547 F.3d at 1100 (under *Rogers* "the level of relevance merely must be above zero"). Warner Bros. use of "clean slate" has artistic relevance to both the film and the websites. Plaintiff's Complaint acknowledges as much in the allegations of its Complaint: "Part of the plot of The Dark Knight Rises involves Batman's promise to another character, Selina Kyle, to procure a software program called CLEAN SLATE that will erase a person's criminal history from every computer database in the world." [DE 1 at 4.] The use of

15

"clean slate" thus has at least the minimal level of artistic relevance to satisfy the low threshold of the first prong.

Warner Bros. has also clearly satisfied the second prong of the *Rogers* test – the film's use of "clean slate" is not "explicitly mislead[ing] as to the source or the content of the work." *Rogers*, 875 F.2d at 1000.  As formulated by the Ninth Circuit's recent decision in *E.S.S.*, "the relevant question" is whether the use of "clean slate" in *The Dark Knight Rises* would confuse its viewers into thinking that the Fortres Grand "is somehow behind" the film or "that it sponsors" the film.  *E.S.S. Entm't*, 547 F.3d at 1100.  *See also Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993) (explaining that the relevant question is whether the defendant's use of the mark "is misleading in the sense that it induces members of the public to believe [the work] was prepared or otherwise authorized" by the plaintiff).

What's more, the fact that it has to be *explicitly* misleading makes this a high bar.  As another court recently put it, "[t]o be 'explicitly misleading,' the defendant's work must make some affirmative statement of the plaintiff's sponsorship or endorsement, beyond the mere use of plaintiff's name or other characteristic."  *Dillinger, LLC v. Electronic Arts, Inc.*, 2011 WL 2457678, at *6 (S.D. Ind. Jun. 16, 2011).  There is no affirmative statement here that would indicate that Fortres Grand sponsored or endorsed the use of "clean slate" in *The Dark Knight Rises*.

Thus, Warner Bros. use of "clean slate" satisfies both prongs of the *Rogers* test.  In fact, Fortres Grand's response to Warner Bros.'s motion never really disputes this.  Instead, Fortres Grand takes a step back and argues that the *Rogers* only applies to cases of forward confusion and not to cases of reverse confusion.   Here's how Fortres Grand frames the argument:

> *Rogers* protects First Amendment interests by permitting artists to refer to culturally relevant trade symbols and identities of others in certain well-defined circumstances.  In a reverse confusion case, however, the more prominent junior user is not attempting to refer to the mark of the less prominent senior user.  In other words, in a case of reverse confusion the defendant is not trying to use the plaintiff's mark expressively, or availing itself illegitimately of the plaintiff's reputation – the foundational rationale of *Rogers* and its progeny.

[DE 26 at 5.]

I disagree with this narrow reading of "*Rogers* and its progeny," and I don't see the logic in distinguishing between cases of forward confusion and reverse confusion in the context of the First Amendment.  Fortres Grand seems to think that for the First Amendment to trump trademark infringement the infringer has to have some well-thought-out, "expressive" critique of the trademark.   Indeed, the sub-text of Fortres Grand's argument is that *Rogers* really only applies to cases that resemble something like parody – instances where "artists . . . refer to culturally relevant trade symbols and identities" and "use the plaintiff's mark expressively." *Rogers* of course does apply to parody, but why should it be limited to that?  Indeed, if *Rogers* didn't apply to cases of reverse confusion, the chilling effects on speech could be enormous. Warner Bros. makes this point deftly in its reply brief:

> Plaintiff's proposed rule would mean that a small, relatively unknown trademark owner, claiming rights in a mark that few people have ever heard of, would enjoy monopoly power over the use of certain words in expressive works – power that the First Amendment plainly denies to the owners of famous, household-word trademarks. If the First Amendment prevents the owners of strong and famous marks . . . from controlling the expressive speech of others, there is no rational basis for holding that the First Amendment freely permits the owners of more obscure marks to dictate the expressive speech of others.  Such a rule, indeed, would be disastrous in practice.  Under such a legal regime, it would be hard to imagine how Warner Bros. possibly could describe the fictional software that Catwoman desires in *The Dark Knight Rises* without exposing itself to "gotcha!" trademark lawsuits from plaintiffs asserting reverse confusion theories.

[DE 29 at 17.]  I entirely agree with this argument and conclude that the *Rogers* test applies to

reverse confusion claims.  Other courts have also applied *Rogers* to cases involving reverse

confusion claims.  *See Webceleb, Inc. v. Procter & Gamble Co.*, No. 10-CV-2318 (S.D. Cal.

Sept. 25, 2012), ECF No. 103; *DeClemente v. Columbia Pictures Indus., Inc.*, 860 F. Supp. 30,

47 (E.D.N.Y. 1994).[2]

The preceding analysis applies equally to the websites at issue in this case.  Fortres

Grand argues that *Rogers* is inapplicable to these sites because they are commercial speech.  I

disagree.  "Although the boundary between commercial and non-commercial speech has yet to

be clearly delineated, the core notion of commercial speech is that it does no more than propose

a commercial transaction."  *Nissan Motor Co. v. Nissan Computer Co.*, 378 F.3d 1002, 1017 (9th

Cir. 2004).  *See also Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149

F.3d 679, 686 (7th Cir. 1998) ("The advertised publications, as we have emphasized, are not

commercial speech because they do not propose a commercial transaction between CTS and a

specific customer.").  The websites at issue here do far more than simply propose a commercial

transaction – in fact, it is hard to see that they really propose any commercial transaction, other

than obliquely convincing consumers to buy a ticket to the film.  Instead, they are creative,

---

[2]Nothing in either *Masters Software, Inc. v. Discovery Communications, Inc.*, 725 F.
Supp. 2d 1294 (W.D. Wash. 2010) or *Rebelution, LLC v. Perez*, 732 F. Supp. 2d 883 (N.D. Cal.
2010) compel a different result.  Fortres Grand claims that these cases support the conclusion
that *Rogers* doesn't apply to reverse confusion cases, but neither case says that.  First, *Masters
Software* explicitly punted on that question: "The court need not decide [the] question [of]
whether the *Rogers* balancing test applies in a [reverse confusion] case like this one."  *Masters
Software*, 725 F. Supp. 2d at 1306 n.7.  Second, *Rebelution*'s holding narrowly reads the "artistic
relevance" prong of the *Rogers* test as requiring defendant's use "to be with reference to the
meaning associated with plaintiff's mark."  *Rebelution,* 732 F. Supp. 2d at 889.  This holding
seems to be an outlier, as other courts have not required nearly so narrow a reading of the first
prong of the *Rogers* test.  *See E.S.S. Entm't*, 547 F.3d at 1100 (under the first prong of *Rogers,*
"the level of relevance merely must be above zero").

fictional extensions of the film – artistic works in and of themselves – and are thus entitled to First Amendment protection.  The *Rogers* test therefore applies, and the analysis is the same as with respect to the film.

Thus, even if Warner Bros. use of "clean slate" could constitute actionable trademark infringement, it is protected by the First Amendment under *Rogers*.

## CONCLUSION

Warner Bros. use of "clean slate" in *The Dark Knight Rises* does not infringe Fortres Grand's  "Clean Slate" trademark both because there is no plausible claim for consumer confusion and because Warner Bros.'s use of the mark is protected by the First Amendment. Therefore, Warner Bros.'s Motion to Dismiss [DE 20] is **GRANTED** and this case is **DISMISSED**.  Given the legal holdings in this opinion, it seems unlikely that Fortres Grand would be able to cure the deficiencies in its Complaint to be able to state a plausible claim for trademark infringement.  Nonetheless, I will give Fortress Grand an opportunity to do so by filing an amended complaint within 28 days of the date of this Order.  If it does not intend to do so, it can advise the court and I will then issue another order dismissing the case with prejudice.

**SO ORDERED**.

ENTERED: May 16, 2013

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT

19